Look at the Supreme Court decision starting 40 years ago when we first started interpreting the Civil Rights Act in 1964. McDonnell, Douglas, and Verdan started back then. Talking about the discrimination could be proved by indirect evidence. So we come up to cases a decade ago or a decade and a half ago with St. Mary's and Reeves, emphasizing that it's up to the jury to make credibility choices. Or if we even bring it right up to date and talk about gross and it's but for a cause standard or whatever. In all those cases and throughout the history of jurisprudence under the Civil Rights Act and under the Age Discrimination Act, there has never been any retreat by the United States Supreme Court or by this court or by any other circuit court of appeals from the basic proposition that it is the jury as the fact finder that decides whatever it is to draw from evidence. Why don't you just focus for us, as you did in your brief, but focus for us again on what you say are the particular fact issues that shouldn't be resolved on summary judgment. Well, what I say is, Your Honor, that there were just a number of facts from which the jury, if they chose to, could infer discrimination. And in answer to that question, if I were going to look at the record and try to find the things to start out with, it would be the fact that employees, these ladies, one of them worked there for 35 years, another one only worked there for 15 years, but they had very responsible jobs. They were the comptroller and the assistant comptroller of the county. The county needed these employees. The jury could believe they were outstanding employees because a campaign promise had been made to keep them. And then within eight months after he comes in, he has fired them and replaced them with employees 20 years younger. So that would be the first thing. You know, Reeves said that a prima facie case itself is evidence of discrimination. The next thing I'd look at is what these two younger employees said, and their testimony is very short, but it's right to the point. And I'll refer, Your Honor, to their testimony. One of them is Purden. This is the youngest employee in the office. Of course, Judge Mills can't see her and you can't see her, but I saw her, and I tell you, she's a very attractive lady. And she was also a lady that he said, according to her testimony, she continuously got favored treatment. He would bring her lunch, ignore everybody else and bring her lunch. He would continuously brag on her performance. And she said it was her firm opinion. She testified it was her opinion. I can give you the page, page 19, that he was trying to get rid of the older employees. And the only reason he would have gotten rid of her would have been a cover because she had no hint that she was about to be fired. She was being nothing but praised. In fact, the other employees would tease her about it. How come you're getting all the special treatment? So there was no explanation for Purden except that she was being used as a cover. And then the other one as to why he fired her. And then Lipsy was the employee whom it's undisputed had some work problems. The judges, there's going to be some debate about the quality of work of just about everybody else, but there's no debate about Lipsy because the judges and the administrators had complained to the clerk about Lipsy that she was behind on her work. And Lipsy's version of it, there's different versions of what happened between him and Lipsy, but what Lipsy says is, and her deposition is very brief on page 383. She just, the statement that she said that he made was, well, you're really my best employee, and I don't understand why you're not doing the job, but you are my best employee, and I'm going to keep the two younger ones, you and Purden, and I'm going to get rid of the others. That is the three older ladies. That was a statement that Lipsy made. And, of course, when he talked to her about her performance, he didn't fire her. The evidence is undisputed that he had never talked to Fitzpatrick or Foster about their performance. In fact, the evidence is that Fitzpatrick was trying to explain to him what she did and how to do the job. So he's faced with a county. I don't know where your Honor reads the newspapers about Mississippi, but we've got a state auditor that's after these officials about keeping up with the money, the county money, and he sues them all the time. You would think the county would want to keep a comptroller that's been there for 35 years, and we have testimony in the record of what a good comptroller she was. Now, I'm aware there's other testimony that he says she was late for work or whatever, but that all was for the jury to resolve. The other thing I would point to, Your Honor, is the timing of it, the timing of what happened when. I think that's what's so important and which discredits the inferences Judge Mills drew from. The timing of it is made clear. I made an error in my brief as to when the first retirement conversations occurred, but counsel described it accurately. It was on Tuesday, September 4th. I think he said it might have been September 5th. But this is the first time that a mandatory retirement was discussed. The new chancery clerk goes to Ms. Fitzpatrick, the lady that's been there for 35 years as a comptroller, and says, Well, what do you think about Lipsett, the young employee? Can we teach her? Can we get her to do her job? Are we able to do it? And Ms. Fitzpatrick said, Yeah, I think she's teachable. I think she could do the job and discuss Senator of Union County or some other county to let her work on her work. But then he took up, for no reason that we can see on that date, retirement. We need you to go ahead and retire. And apparently it was just a small discussion at that time. But then the record is on September 6th is when the blowup came. September 6th he came in, and there's differences in the evidence about exactly what happened on December 6th. But according to Foster's testimony, he came in and discussed, wanted all three of the older employees to retire. There's some evidence that he talked to Fitzpatrick first, and she was so upset about it. They make it look like it was just like, Oh, well, this will be fine. We've talked about retirement first. But Fitzpatrick was so upset about it, her blood pressure went up. She said, I'm not financially able to retire. I have a 10-year-old child. And she went into the hospital. She got so upset about it on that date that she was being forced out. She went into the hospital. And Ms. Foster, that happened on the 6th. Ms. Foster said she told him at that time, you're just forcing us out. And then made, you're just forcing us to retire. And then Judge Mills based his opinion on or how he came to his result was he said that he believed his opinion of the evidence was that the real reason they got fired or the final nail in the coffin was because Foster had talked to an employee named Troy Ward. She's a relative of the Chancellor's clerk, and she works in another county office there. That he had talked to Troy Ward and told Troy Ward that he was not a man of his word. And so that's what Judge Mills accepted as being the reason, the alternate reason as to why he fired him. I have a question about that. The other employees, though, weren't involved in that. So how can that be the reason that they were, the nondiscriminatory reason that they were fired? Further proof of pretext, Your Honor. The other employees were absolutely not. Foster was the only one. He said that himself, that Foster was the only one. And Judge Mills said that, that Foster was the only one that he had any evidence and made any statement. But a jury could find the decision that they were going to retire had already been made on the 6th. The jury could draw that inference from how upset she was and how Foster was, how Foster then talked to this relative. And I think it's important about how Foster, Your Honor, I refer you to page 453 of the record. Judge Mills didn't think Foster had any credibility. I thought she has a lot of credibility. But look on page 453 of the record. Should he be looking at whether she has credibility? No, no, no, Your Honor. No, he shouldn't. He should not. And no, I'm just afraid that maybe the courts have gotten the impression that because of this Gross case that they can now determine credibility. But they shouldn't. If there is pretext, then it has to go to the jury. Yes, ma'am. If there's evidence of pretext or, Your Honor, I believe if there's evidence that age is a more likely reason. Because there is. Yes, ma'am. But you don't, what if it's a combination, though? You're not going to be successful, are you? I'm sorry. It's a combination. But the jury has to find but for. But in that situation, Your Honor, I think it's important. But I think Judge Mills has the impression and some other district judges do possibly that where Gross has changed everything and the standard of summary judgment is higher. I hope the court will address that because I do not believe that's true. It's not supported by the precedents, by law review articles. I don't think there's any higher standard for summary judgment because of Gross. Gross was a jury instructions case. What was a proper jury instruction? So you don't think that you could say in light of Gross, well, if there are multiple reasons, there's no way they're going to make the but for. And so we should go ahead and pour them out now. You don't think the district court should be able to do that post Gross? No, ma'am. I don't think that just because they testify there are other reasons. That would mean you get summary judgment in every case because the employer is always going to have some reason that he's going to give. But one hard thing about this case, though, is you would agree, sir, wouldn't you, that he could have come in the first day and cleaned house? Yes, ma'am. He could have, but now a jury could draw a different image from what Judge Mills drew. He could hardly. It would be very difficult for him to come in there. He had to get the Golden Development District to come in to supply him with a staff immediately, a short-term staff. He would have had to have had some time to make arrangements to get somebody in there that could confidently do the job, and he obviously didn't have anybody at that time. But the fact that he could have done it at one time doesn't mean he didn't do it discriminatorily. It might have taken him some time to get up his nerve because he'd made a campaign promise to the voters he was going to keep them. So a jury could infer that he just wasn't able to get up his nerve, his mind to do it. The record gives a very poor impression of him and of his personality. I mean, the court hadn't seen him and the jury hadn't seen him. But there was testimony from one of these younger employees that a supervisor kept talking to him and saying the clerk is unteachable. We have a Chantry clerk that's unteachable that can't learn to do the job. So he could have been upset about a lot of things other than just her statement. If you didn't have the retirement of Fitzpatrick and all that, then you wouldn't have a case, do you think? That September 6th retirement offer or demand or whatever it was? I'm not sure about that, Your Honor. I'm not sure of the answer to that question. But I think one of the strongest points of our case is that before he knows anything about Foster's statement, this is on the 6th, before that he is in effect forcing them to retire. He's saying you have to retire. Here's your retirement package. The timing of it, in other words, when Judge Mills says, well, it's all because Foster made a statement to one of the Chantry clerk's relatives saying he's not a man of his word, that that's the reason they fired him. The problem is he's already told them before that, earlier on the 6th. In addition to that, it's important as to exactly what I indicated to the court on page 453 of her testimony and then on page 481 of the lady he was talking to, Ms. Ward, of their version of what that conversation was. Here's what Ms. Foster says that she describes it. Gary wants Anita, that's Ms. Tudor, she's not a plaintiff, me and Mildred to retire. I said I'm not going to retire. I said I thought Gary was a man of his word, but I've decided he's not because he told us at the very beginning we would have a job as long as we wanted it. Nobody was going anywhere. But in other words, it's coupled with a retirement. He's come in and told us that he wants us three to retire. Now, they've got a different version of it. They say the third lady that's not a plaintiff, but it was actually her idea. There's a different version of it. But then go over, Your Honor, on Ms. Ward's testimony. I have a serious error in my brief when I said Ms. Ward's deposition wasn't taken. It was. And the key part of it is on page 481. And she also says that it was about retirement. I'm quoting her. I'm quoting her version of the conversation that happened. They said it was on a Friday. It might have been that weekend. She, me and Ms. Foster, said he was talking to her about wanting her to retire. And he told her that she had a job, and she thought he was a man of his word. And I said he is a man of his word. In other words, there's kind of this disagreement here between Ms. Ward, the chantry clerk's relative, and ultimately that conversation was relayed to Ms. Ward's daughter. So in any event, the jury could infer from the record that the fact that he can't trust them because they're not liking him and talking about him is actually derivative of the whole retirement thing to begin with. Absolutely. That it came from retirement. The Supreme Court said, I should have cited this case, but the Supreme Court said in the Jackson case that firing somebody because he's complaining about being discriminated against is itself a form of discrimination. I'll do a 28-J letter on that, but I should have cited that case. But the whole reason, according to Judge Mills, Judge Mills said the final nail in the coffin or whatever it is that Foster was complaining about him, what she's complaining about is he's forcing me to retire. And I don't understand the argument that forcing somebody to retire cannot be inferred to be a form of age discrimination. To me, a jury could find retirement means I want you out of here because of your age. That's what it means by definition. Your Honor, there's evidence on their side, and you're going to hear some. I'm sure there's evidence. Almost every case is they have evidence on their side. But one of the things that they're going to talk about is that at least Fitzpatrick and maybe Foster had asked early on, like months before, how much would I get if I retired? And they testified they did that just out of curiosity. Could I afford to retire? They had done that, but it doesn't mean conclusively that they wanted to retire. The evidence shows to the contrary. All right. You've saved time for rebuttal, Mr. Wade. Thank you, Your Honor. Judge Kishan. May it please the court. A couple of things I want to address early on. Judge Meehl's decision, and nothing that's been said today changes that. His finding was that there was no evidence to refute the reasons given by the chancery clerk for this decision. And I'm going to go through the reasons for the decisions and how that played out the timeline. So the cases that Mr. Wade talks about, there's always a question about the reasons given. There are no questions about the reasons given here in this case. The second thing is that absent question of fact on that issue, you can't infer age discrimination unless you've got some evidence that age was a reasonable juror, some evidence that it was the but-for reason. But-for is a higher standard than the normal standard. How can you say there are no questions about the reasons given when we just had questions about the reasons given? That's exactly what the questions were about during the prior argument, whether or not the people that were fired were part of the disloyalty. That's one question. And whether the disloyalty came about because of the alleged discriminatory conduct. Judge, I'll speak to that. Two things on that. The disloyalty and the support, there's no dispute that throughout those eight months, folks were coming up to Mormon and talking to him, and that's the chancery clerk, about watch your back. Your folks don't support you up there. So there was already that backdrop. Mr. Mormon had been elected really out of nowhere and replaced a 25-year chancery clerk. These ladies had worked for the 25-year chancery clerk. When he came into office, he was new to that job. The old clerk had been defeated or was retired? He had retired. He retired on his own, but he was still around. And these ladies were very fond of him and spent a lot of time with him, even after he's retired. He was still up at the office some, that kind of thing. So Mr. Mormon walked into a difficult situation in terms of trying to get these employees to do things the way he wanted them done. These ladies had done things their own way, and some of the things were good, some of them maybe not so good. And so what he testified to is they would not work with him on different things that he wanted. Well, and one or more of them said that that's just the way we always did it. That's right. Correct, Your Honor. And so it was not just the statement by Ms. Foster. Now, that was the culminating blow when he heard from a citizen called him. One of his supporters called him on the phone on a Friday afternoon. You just need to know what one of your employees said about you. And that's how that happened. Now, and that culminated at the end of a tough, tough week with everybody. The other thing I'll mention briefly before I go on, the mandatory retirement issue. There was no mandatory retirement. Ms. Fitzpatrick had been with the county for 35 years. She was 51 years old. She'd been working since she was 16, worked in some high school program. And so she'd been there a while. Mr. Mormon himself was in state government, so he knew about retirement. He had been in state government himself for about 29 years. And in March of 2012, Ms. Fitzpatrick had had a disagreement with the president of the board of supervisors. She thought she was going to lose her job from that president of that board of supervisors. That's when she looked into retirement. And Mr. Mormon helped her. He signed off for her to look into retirement. So he was aware that she was considering retirement or at least looking into it. So we move forward to September. He, in really an informal conversation, looked at her and said, You know, you've got a lot of years. It may be beneficial to you to consider retirement. You've been up here for 35 years. The 13th check, which you all may be familiar with. I'm not exactly familiar with it, but it's a separate check that can be pretty substantial. It allows you not to work but to get your retirement and then get a 13th check. He mentioned that to her. She seemed interested. She said, Mr. Mormon, you know, I'm worried about that a little bit. I can't do without my insurance. He went home that night, worked up the package. It was not retirement. It was retirement plus part-time work. They were both going to continue to work in the thing that he proposed to them. It wasn't getting rid of them. It was retirement, part-time work. It was a good deal for her. And he just thought she needed to be aware of what it was. What happened the next day when he brought that to her attention, she discussed it with Foster. He never even intended to offer any package to Ms. Foster. But once they discussed it, he said, yeah, you can do this too. And she became angry about it. Fitzpatrick was receptive of it until she talked with Foster. Anyway, and so he said, no, don't worry about it. That's okay. He didn't have to go to the hospital? It's after she talked with Ms. Foster because Ms. Foster told her he's trying to get rid of us, even though it was part-time work, retirement and part-time work, so you keep your insurance. And the other thing that's not accurate about the retirement for all the employees, he did not offer any package to the 59-year-old Anita Tudor. That's unrefuted. Ms. Mormon went through. There's no testimony from Anita Tudor any different. He did not offer her a retirement package. One of the employees came in and said, hey, Anita Tudor's angry because you didn't offer her the same thing you offered the other two, or that you talked about with the other two. Mormon went to her and said, look, Ms. Tudor, you haven't been here long enough for this to be beneficial for you. You know, if you want something like that, I'll look into it, but it's not going to be beneficial for you. He also told Ms. Foster the same thing. You haven't been here long enough for this to be beneficial for you. So that was the mandatory. That's not mandatory retirement. That is discussing an opportunity, particularly for Ms. Fitzpatrick, who was only 51 years old. Didn't offer it to the 59-year-old, which is another indication that age had nothing to do with his thinking when he talked retirement with these ladies. Now, in looking at, again, Mr. Mormon knew he was a novice to this job. He didn't run for reelection. He did his four years, and he's leaving at the end of 2015, end of this year. Now, Ms. Fitzpatrick? On the person's impression that it was about pushing out the older people. Two things. A couple of things on that, Your Honor. I'll get over to my notes on it. Ms. Purdon, the employee that he mentions, had that opinion. She also had an opinion earlier in her deposition that it was politics, that they were all being forced out because of politics. Then, after being led through by the attorney for Fitzpatrick and Foster, she said, and I quote, to make it look like it was age discrimination or favoritism, I guess. I don't know. That's my opinion. Your Honor, we respectfully suggest that that is not evidence or an opinion that can allow a jury to infer age discrimination. That is on the record of appeal 229 and 230. She had other opinions throughout her deposition, and then at the very end on redirect made that statement. I don't know. That's my opinion. That's not evidence to allow an inference of age discrimination. We respectfully submit. Now, the other issue that he mentioned was being replaced by younger employees. Again, when Mr. Mormon made this decision, I think going through the facts that I think are unrefuted, you mentioned, Your Honor, that there may be some things to refute that. Judge Mills made it clear that he didn't believe there was anything to refute why Mormon made this decision. And what you look at, what he looked at, and Mormon was clear throughout. He had talked with them. He was going to make some changes in the chancery clerk's office. He put together a document for each of those employees to sign that talked about misuse of phones, being on the phone too much, playing computer games too much. This is all after he had the talks, these retirement discussions. These are all after discussions with Cammie Lipsey about her job. He met with Supervisor Ernie Wright, and Ernie Wright encouraged him to work with it, try to work this out. Because, as Ernie Wright said, when he talked with him, this was a man backed into a corner, and he couldn't get control of his office. So what he did was he went home, put together a document outlining problems that he saw in the office. He was going to install a time clock because of tardiness. Excessive computer time. This is all on, the document is on Record of Appeal 198 and 99. Personal phone calls. Attitudes towards citizens. There was not, there was more than just their attitude to each other, I mean to Mormon, to supervisors, and then having personnel files. Mr. Wade mentions that they all had spotless records. There weren't essentially any personnel files. No, there had been no, any discipline of anybody in the Chancery Clerk's office for 25 years. Because you had a 25-year Chancery Clerk that was sitting in their ways. Now, after he put together all of this, met with Mr. Wright, Supervisor Wright, he gets home, he gets the call about the comment. He was ready to provide an opportunity for everybody to work together and go forward. He gets the comment, comes home a citizen. Now, Ms. Foster doesn't dispute that she's made those comments. She also doesn't dispute that she had commented even before that he wasn't aware of this, but rumors in the community that she had told people he was incompetent. And Ms. Fitzpatrick had done the same thing. There's testimony from Elisa Fowler at the Circuit Clerk's office. Fitzpatrick and Foster both saying he's lazy, he's incompetent, he doesn't know what he's doing. Is there testimony that he knew that at the time? The testimony . . . Fitzpatrick saying that? Judge, the testimony is that people would come and talk to him, nothing specific. That they would talk to him about, you better watch your back. These ladies are not supportive of you. Watch your back. And from the Circuit Clerk and others. What about the other one? The third. Is everybody? I mean, I don't know that everyone's implicated in that. Correct. What everyone . . . it was a group, and he felt like after that comment and all that was going on with the different things, that he just needed a new group of people working for him. He went off. He made that decision. Certainly it was a rash decision. But what it is . . . we can question that decision, but I don't think you . . . I respect Ms. Smith, you can't question whether it was because of their age. It was because of this comment and all the things that were going on. It happened. He made the decision to let all of them go after he became a citizen and talked to him about this comment. How does it work in that clerk's office? The Chancery Clerk, do they have the whole power? Or is it the supervisor has some kind of . . . That's a good question, Your Honor. The Chancery Clerk, the Pontotoc County Board of Supervisors, gives the Chancery Clerk full authority over them. Now, that's a good . . . Moorman retained all five of them, including Fitzpatrick and Foster. Fitzpatrick and Foster in controller positions, but they all worked in the Chancery Clerk's office, so he had full control. He was the county administrator. He was appointed county administrator when he took office. Okay, so it's not where he could get them out of his realm, but he can't . . . Correct. They're all . . . They are ultimately his final employees. And he discussed it with the supervisors. And each of the supervisors, Your Honor, you asked about what did he know. Did anybody . . . Each of the supervisors in their testimony talked about it. There was tension in that office. Everybody was aware of it. And he met with them after he called Ernie Wright that Saturday morning. Everything was going to be fine until that statement. And he made the decision at that point that he didn't believe he could work with them. He still struggled with it over the weekend and finished up that list. He talked with Ernie Wright and said, I'm done. The testimony of Ernie Wright, another supervisor, is compelling. And he talked with him and said, I'm done. I can't deal with this anymore. And that was a Saturday morning, moved into Sunday, called other people. Had supervisors meeting up at another office and told them, you know, that I became aware of a comment. I just can't work with these ladies. They're not working with me. I'm thinking about letting them all go. They encouraged him to consider other options. He left that meeting, went up and called them all in. And at that point had his sheet there to try to work through, but made the decision, I just can't do it. And dismissed all five of them. And it all culminated with the comment by Ms. Foster without question. That was a Friday. He was working with Ernie Wright to try to work out a path to compromise. Found out about that comment from a citizen. It angered him. And he made the decision to let them go. Now, you look at the ages of all of them. I think that's another indication it's not their age because he let them all go. And then as to who replaced who, the replacement process was with Mr. Mormon. And he interviewed with Three Rivers Consulting Group that helps Pontotoc County. They have a consulting contract with them. And they just chose five people to come in there and replace. And so when we talk about, Your Honor, the reasons for the decision, the timeline of how things occurred, it makes it clear the decision was made after he learned of that comment. And it is nothing to connect this to age, nothing that would allow. But the comment itself connects to age because she's complaining allegedly, according to Mr. Wade, that he's not a man of his word because he's making her retire when he said that he would keep her. Well, two things. One, he wasn't, and it was clear he wasn't making her retire. I understand the point on that. But the other thing is what a citizen told him or somebody that Ms. Foster had told her mother, that you're not a man of your word. Now, this is a chancery clerk that's an elected official. And you've got somebody in your office going out and making these statements about you. You're not a man of your word. If he had chose to seek re-election, those kind of things are pretty difficult to be re-elected. And then you've got, Your Honor, then you've got other rumors where these two, particularly these two, both admit that they're talking negatively about Mr. Mormon in the community. He's getting wind of just watch your back, that these folks are not supportive of you. And that's a reason, and it's the only reason shown here for these decisions, the way it played out that week with how things worked out. And it's clear he was going to try to work with them. Got wind of the comment, had enough, and let them all go. And just a fresh start for him at the chancery clerk's office. Well, Mr. Wade referred to a case that he hadn't cited that says that if you're complaining about the discrimination, then that can't be the thing that you're not allowed to fire someone on that. You haven't had a chance to look at that. So when he sends in his 28-J, you may have some comment. Or maybe you have a comment now. Yeah. My comment to that would be what he learned from the citizen was that she had said he was not a man of his word. That was what she told him. And this culminated a whole laundry list of other situations where people had come to him and told him that your clerks are not supportive of you and you need to watch them. And also the tension in the office, you know, supervisors talked about it. Everybody was aware of it. It was a difficult deal. A lot of it's difficult because Mormon was coming in new and fresh. He was a novice to this job. And these ladies believe they knew more than he did. And I think they treated him that way, and it's pretty clear. And maybe they did. But he's the chancery clerk, and they need to work with him and not tell folks he's incompetent and lazy out in the community, other workers in the community that he's that way. That makes it tough on a chancery clerk. And that's what the record, that's clear. That's all clear in the record. Judge Mills found that Foster and Fitzpatrick didn't offer any evidence to cast doubt on Mormon's backdrop and how he went through the decision process. And we argue that in our brief, and it's clear that he went through steps and was ready to work with them, learned of this comment, and just blew up about it and made the decision as rational as it may be. There's nothing to indicate age created his rationness at that point. And I think that's what Judge Mills correctly held. And as he stated, we shouldn't be concerned with the wisdom of the decision but whether you can infer age from any of the evidence that is offered. And the retirement matters, we discussed them. She was 51 years old, Fitzpatrick. Foster was not even going to be offered anything until she got what Fitzpatrick was offered. And all that happened before. After that, he was putting together a plan to go forward with them. It was retirement plus part-time work as well. So I think that's a big point. And then the evidence from the other younger employees, what they said, they were all over the board. That's a lay opinion in our view and we respect what was submitted that doesn't allow an inference of age discrimination. You're repeating yourself now, aren't you? Yes, I am, Your Honor. Thank you. Thank you. That's all I have unless I have any more questions. Mr. Wade, you saved time for a vote. Your Honor, support please. I'd like to refer Your Honor to some testimony on 365 and 366 of the record where we're being asked about what Fitzpatrick was doing. This is a question by my co-counsel Ron Woodruff. We're talking about Ms. Fitzpatrick right now. This is Mormon. Okay. Did anybody in the community say anything about her being disloyal or disrespectful about you? Answer, no. This is what Mormon says. Okay. So that's only going to be Ms. Foster. Is that correct? Uh-huh. Indicating yes. Ms. Foster. Now, there's testimony both ways about, well, the whole office doesn't like me. You know, the whole office is disloyal to me. But logically, Ms. Purdon unequivocally testified, I never said a word about him except to my family. Yeah, I told my immediate family he was incompetent when they would ask. And I had a supervisor that was always criticizing him or saying he was unteachable, but I never told anybody in the community. That's what she testified to. And Judge Mills, Your Honor, frankly just does not have any authority to say that I think this lady was all over the page or she's not believable. That was up to the jury. But even that could be that members of the family went out and talked, that common sense. It could be, Your Honor. But that's the type of question that ought to be left to the jury as to whether that was the case or whether he really wanted to get rid of them because of their age, just like it's a question when he says, well, it was really voluntary. They really wanted to leave. They really weren't forced out. That's just a question for the jury. Mr. Wade, isn't this a really hard case, even if you're technically correct, that if you have to go but for, that politics is going to be one of the causes at the end of the day? Isn't that what makes this case hard? Your Honor, just about, you know, we've had these laws now for over 40 years, and by now employers know that you can't admit discrimination, and they're just about all hard. They all have sophisticated lawyers, and they all know that age discrimination is illegal. But it's a hard case. It would be a hard case for the jury, Your Honor. It would be much easier to decide, Your Honor, to have people of labor who work in the workplace every year, and they hear one witness at a time, and they make the decision, rather than a court, which Your Honor has to now evaluate in 20 minutes of argument what each side summarizes the evidence to be and make a decision, or Judge Mills had to make it from the paperwork. Well, we read the briefs, I mean the record, too. I understand. When you do it, though, Your Honor, it is going to be a hard case because there's evidence both ways. Well, if it's evidence both ways, we have to then. If there's evidence. That's good for you. Yes, ma'am. It has to go to the jury. Just about anything he says, you could draw the inference. You know, when he says, well, at one point he told them they could stay on working for the county. Well, the arrangement was their primary work was for the county. They sit out in the chancery clerk's office. The county pays, I can't remember the percentage, but almost all their salary. They do the bookkeeping and the controller work. They sit out in the office where the public comes in and they can help if there's overflow work, like Ms. Patrick and Ms. Foster. So when he says they can work for the county, what he's saying, I'm going to get somebody else out here. A jury could infer somebody younger to sit out here that the public is going to meet. But as far as the work that they do, it's for the county. It wasn't doing anything to indicate he wasn't discriminating against them. He's just saying, we'll work out something for you to do that bookkeeping work in the back. So the jury could infer that that in itself indicated that discrimination or he didn't want it. Your Honor, the only thing I could say is, I don't know whether Your Honor would be interested in this, but out of a precaution I'll send it to you. There's an article by a New York, I'm sorry, Iowa federal judge in a recent law review article in the New York Law Review saying essentially that we need to repeal Rule 56 altogether because it's gotten to the point to where the courts are deciding questions of fact and we don't have any roles for juries anymore. And I just sincerely hope that that doesn't happen. I mean, I hope we have a Seventh Amendment, and I'd like to see it be less expensive not to have Rule 56. The jury ought to decide these type of questions and not in an argument between me and Mr. Huskinson about what the facts were or what inferences were to be drawn. Well, it's true that a jury could probably try the case in three days. We have a rule that we have to follow, don't we, and we're a court of law. As it is now, yes, ma'am, they have. But less expensively, you know, you could take the defense attorney's fees and it would be less expensive to have a three-day trial than it would be to do all this. So, and I hope Your Honor, when it looks at Gross, will hold that that is a jury instructions case. It's not relevant at this point. All right, thank you, Mr. Wade. Thank you, Your Honor. The case is under submission, and the court will take a brief recess.